Filed 1/4/19

CERTIFIED FOR PARTIAL PUBLICATION[*]

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE, | C083509 |
| Plaintiff and Respondent, | (Super. Ct. No. 16FE002037) |
| v. | |
| MARKECE JOVON CHATMAN, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Sacramento County, Paul L. Seave, Judge. Affirmed.

Randy S. Kravis, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Robert Gezi, Julie A. Hokans, Deputy Attorneys General, for Plaintiff and Respondent.

---

[*] Pursuant to California Rules of Court, rules 8.1105 and 8.1110, this opinion is certified for publication with the exception of parts II, III, and IV of the Discussion.

1

The jury's verdict finding defendant Markece Jovon Chatman guilty of pimping and pandering was based on the testimony of a prostitute, who admitted lying and told vastly different stories each time she gave a statement or testified, the text messages she exchanged with defendant, and a letter defendant wrote to a woman in Texas pleading with her to claim in an affidavit that she sent the text messages to the prostitute. On appeal, defendant alleges that instructional error and ineffectiveness of counsel necessitate reversal of the judgment. We disagree and affirm the judgment.

## FACTS

Antoinette was unhappy living at home with her mother, stepfather, and other relatives. She had no income and felt "out of place" and "lost." She wore a necklace with the ashes of her son. Her cousin, who had been working as a prostitute, encouraged Antoinette to join the profession and when she agreed, the cousin schooled her on the way to make a living and stay reasonably safe. The cousin advertised Antoinette's services on Backpage.com, a website utilized by prostitutes and their customers. The cousin also introduced Antoinette to defendant so he would help with her prostitution.

The introductions were by phone calls and text messages. Defendant was listed as "Dad Mob" in Antoinette's contacts. She explained that a pimp is often referred to as dad or daddy by a prostitute. Defendant asked Antoinette for a picture and asked who had advertised on her behalf. He complimented her on the picture and assured her they would "go get on us [*sic*] a program." He told her he wanted to take her on a trip to the Bay Area. When she specifically asked if he would have her "walking," defendant responded, "[j]ust a lil" and volunteered to post ads for her services on the internet. On the first day they met in person, they left Sacramento for the Bay Area.

Given the inconsistencies in Antoinette's testimony and statements to the police, it is nearly impossible to construct a timeline of what happened and when. What is clear from the record is that Antoinette spent about a week with defendant, leaving Sacramento

2

and traveling with him to Vallejo, San Jose, Concord, and San Francisco. She left Sacramento with hopes of having a romantic relationship with him while working together to expand her business opportunities. In Vallejo, defendant picked up some provocative clothes from a storage unit for Antoinette to wear while she worked. Antoinette testified defendant dropped her off in San Jose, handing her condoms and warning her not to engage in prostitution with black men. She was more successful in Concord where she had three or four car dates having either oral sex or intercourse with her clients.

How much money she actually made, if any, walking the streets and getting dates, including car dates, is unclear. She testified business was sometimes poor, the relationship with defendant soured quickly, defendant slapped her, they slept in their car, and she asked her mother to send her money. On one occasion, Antoinette sent defendant a text informing him that someone was following her. He responded, "Just walk and pay attention to the money but watch yo back ok im.out and stay off phone till serious." While the details shifted with each telling, she consistently testified that defendant advertised her services, encouraged her to commit acts of prostitution, and reaped the benefit of the money she earned. Indeed, she testified she gave defendant all the money she earned as a prostitute during the time they were together. He used the money to buy food and gas.

Midway through the trip to the Bay Area, Antoinette's cousin appeared. At trial, Antoinette remembered that day as lucrative. Again she gave all the proceeds to defendant.

Antoinette became disillusioned with defendant and prostitution. On one occasion, a customer tried to hit her with his car. Scared, she called defendant who insisted "bitch, stay out there." In San Francisco, Antoinette was unsuccessful landing any customers despite walking the streets for a few hours and the tension between Antoinette and defendant grew. At one point, defendant became angry when he saw her

3

talking to different men. He took her into an alley and, choking her, ordered her not to "do no shit like that again." In response to her complaint he was hurting her, defendant responded, "Bitch, I don't give a fuck."

By then, Antoinette wanted to go home but defendant told her "no, to go and make some more money." She finally "had enough." Unbeknownst to defendant, she called another cousin to pick her up. Scared of defendant, she left with her cousin without her suitcase, her clothes, her medication, her identification, and, most importantly, the necklace with her son's ashes. She later attempted to get her property back from defendant but was unsuccessful.

They corresponded by text messages after she returned to Sacramento. He wrote: "[W]e can work around jail all u gotta do is dress a certain way and once we leave the bay its a different ball game but u panic and not giving me the time [¶] . . . I need with us so u can understand any thing im go be by yo side and love u hold u laugh with u and enjoy life to the fullest if u stop these mixed though [¶] . . . [¶] Its yes or no u comin home so we doing us mfs just trying leave cali and be happy it get tough and hard but its about us but if its not good baby im done [¶] . . . [¶] My family know i pimp but know u my girl I got yo shit put up right now like I care [¶] . . . Im cool nett dont hit my phone or try and text me if u not fucking with me all this is just slowing me down i dont let nothing come inbetween or stop my program . . . ."

There were several text messages retrieved from Antoinette's cell phone involving actual prostitution transactions with customers requesting a "30 qky," referring to a quick 30-minute prostitution encounter and another asking if the texter could pay a $30 donation for a 15-minute quickie. In yet another text exchange, Antoinette and her customer negotiated a quickie in her car.

In a letter addressed to a woman in Texas, defendant, while incarcerated, asked the woman to sign an affidavit that she used his phone to send text messages to Antoinette about pimping and prostitution because she was jealous of Antoinette.

4

Defendant did not testify and presented no evidence in his defense.

## DISCUSSION

## I

## Pandering When the Victim is Already a Prostitute

Defendant was convicted of pandering in violation of Penal Code section 266i, subdivision (a)(1), not subdivision (a)(2). A person violates subdivision (a)(1) when he or she "[p]rocures another person for the purpose of prostitution." (Pen. Code, § 266i, subd. (a)(1).) Subdivision (a)(2) includes several other elements providing, in pertinent part, that any person who "[b]y promises, threats, violence, or by any device or scheme, causes, induces, persuades, or encourages another person to become a prostitute" is guilty of pandering. (Pen. Code, § 266i, subd. (a)(2).) Defendant contends the trial court erred by refusing his proposed modification to CALCRIM No. 1151 and his lawyer provided constitutionally deficient representation by failing to request additional modifications. Having conducted a de novo review of the alleged instructional error, we conclude his arguments are without merit. (*People v. Posey* (2004) 32 Cal.4th 193, 218.)

Defendant submitted the following proposed instruction:

"The defendant is charged in Count 1 [*sic*] with pandering in violation of Penal Code section 266i(a).

"To prove that the defendant is guilty of this crime, the People must prove beyond a reasonable doubt the following elements:

"1. The defendant successfully caused, induced, persuaded or encouraged Antoinette Doe to become a prostitute;

"2. The defendant successfully caused, induced, persuaded or encouraged Antoinette Doe to become a prostitute by promises, threats, violence or any device or scheme;

"AND

5

"3. The defendant intended to influence Antoinette to be a prostitute.

"Whether Antoinette was a prostitute before meeting the defendant is not a bar to pandering." (Fn. omitted.)

The trial court found the proposal inaccurate in part and no better than the standardized instruction in part. The court instructed the jury on pandering as follows:

"The Defendant is charged in Count 2 with pandering in violation of Penal Code section 266i. To prove that the Defendant is guilty of this crime, the People must prove that, one, the Defendant successfully persuaded Antoinette Doe to become a prostitute, and, two, the Defendant intended to influence Antoinette Doe to be a prostitute.

"It does not matter whether Antoinette Doe was a prostitute already." (CALCRIM No. 1151, as given.)

Defendant's modification to the instruction and his claim his lawyer should have attempted to modify it even further is based on a misreading of *People v. Zambia* (2011) 51 Cal.4th 965 (*Zambia*). The most obvious flaw in defendant's argument is the fact Zambia was prosecuted under Penal Code section 266i, subdivision (a)(2), not subdivision (a)(1). As the trial court found, the prosecution had no burden to prove element No. 2 of the proposed modification that defendant used "promises, threats, violence, or any device or scheme" to encourage Antoinette to engage in prostitution. The court quite properly struck that part of the proposed instruction as it was not an element of the charged offense.

But the thrust of defendant's argument on appeal is his notion that if the pandering involves a person who is already engaged in prostitution, *Zambia* requires a change in the prostitute's business model or the establishment of new working relationships in the trade as a result of the panderer's involvement. It is true that the focus of the analysis in *Zambia* was the statutory language contained in subdivision (a)(2) "to become a prostitute." And the question was whether a prostitute could "become" what she already was. The court recognized "that when a pimp offers protection and support to a prostitute

6

in return for some or all of her income, the offer increases the likelihood that the prostitute will be able to maintain or expand her activities, an outcome squarely at odds with the statutory goal." (*Zambia, supra*, 51 Cal.4th at p. 974.) The court further found that "[t]o encourage an established prostitute to change her business relationship necessarily implies that a defendant intends a victim 'to become a prostitute' in the future regardless of her current status." (*Id.* at p. 975.)

Again we point out that the targeted language "to become a prostitute," while central to the analysis in *Zambia*, is not an element of the pandering offense with which defendant was charged and convicted. Penal Code section 266i, subdivision (a)(1) requires only that a defendant "[p]rocures another person for the purpose of prostitution." As a result, *Zambia*'s extensive analysis of what it means to become a prostitute is inapplicable to a subdivision (a)(1) prosecution.

Nevertheless, because the trial court instructed the jury that "[t]o prove that the Defendant is guilty of this crime, the People must prove that, one, the Defendant successfully persuaded Antoinette Doe to become a prostitute" with the additional caveat, "[i]t does not matter whether Antoinette Doe was a prostitute already," we briefly address the defendant's misunderstanding of *Zambia*'s holding. Defendant reads *Zambia* to require a change in a prostitute's business model. In his view, if Antoinette merely maintained the same type of prostitution business she operated before they met, then he was not guilty of pandering and the jury should have been instructed on this important nuance. His lawyer, he insists, was incompetent for failing to request an instruction capturing the significance of the requisite change in business model or change in her working relationship.

*Zambia* does indeed focus on the prostitute's future behavior. But the involvement of a pimp or panderer almost by definition changes the prostitute's business. As quoted above, the court in *Zambia* recognized that the protection provided by a pimp, in conjunction with the services he provides in advertising the prostitute's services and

encouraging her to engage in prostitution, promotes her business and influences her future conduct. (*Zambia, supra*, 51 Cal.4th at pp. 974-975.) To overcome the argument that a prostitute already in the business cannot "become a prostitute" if she already is one, the court necessarily emphasized how the pimp or panderer's involvement influences her future behavior. Thus, although she had been a prostitute in the past and/or continued to be a prostitute in the present, a pimp's assistance facilitated her prostitution in the future and met the statutory definition.

Defendant, however, overstates the type and degree of change that must occur in the prostitute's operations. He suggests a wholesale revision in the business model is needed to demonstrate that the panderer had a palpable impact on the success of the business endeavor. In the absence of a significant change in how a prostitute does business, defendant maintains the pimp or panderer has not influenced her future behavior, has not contributed to additional prostitutes on the street, and has not committed the evil the pandering statute is designed to prevent. We disagree this is what *Zambia* requires, what the statute requires, or what common sense requires.

" 'The purpose of the anti-pandering statute [citation] is to "cover all the various ramifications of the social evil of pandering and include them all in the definition of the crime, with a view of effectively combating the evil sought to be condemned." [Citations.]' " (*Zambia, supra*, 51 Cal.4th at p. 973.) Moreover, " '[a] substantial potential for social harm is revealed even by the act of encouraging an established prostitute to alter her business relations. Such conduct indicates a present willingness to actively promote the social evil of prostitution.' [Citation.]" (*Id*. at p. 974.)

The caveat the court gave the jurors correctly emphasized that the fact Antoinette was already a prostitute did not matter. We agree with the trial court the defendant's proposed modification instructing the jurors that "[w]hether Antoinette was a prostitute before meeting the defendant is not a bar to pandering" did not improve or clarify the standardized language in any meaningful way. The court did not err by refusing such an

8

inconsequential alteration of the time-tested standardized instruction.  There was no instructional error.  And because we reject defendant's characterization of the *Zambia* holding and conclude the prosecution need not demonstrate a demonstrable change in the prostitute's business model, defendant's lawyer did not fail to provide constitutionally adequate representation.

## II

### Sua Sponte Duty to Instruct on Witness Credibility

The trial court instructed the jurors pursuant to CALCRIM No. 226 that, in evaluating the credibility of a witness, they may consider if the "witness [made] a statement in the past that is consistent or inconsistent with his or her testimony," if the "witness admit[ted] to being untruthful," and if the "witness engaged in other conduct that reflects on his or her believability."  Defendant argues the court had a sua sponte obligation to give an additional instruction on witness credibility as set forth in CALCRIM No. 316, Alternative B as follows:  "If you find that a witness has committed a crime or other misconduct, you may consider that fact [only] in evaluating the credibility of the witness's testimony.  The fact that a witness may have committed a crime or other misconduct does not necessarily destroy or impair a witness's credibility. It is up to you to decide the weight of that fact and whether that fact makes the witness less believable."  Defendant is mistaken.

CALCRIM No. 316 is a limiting instruction, and therefore, it need only be given upon request.  (*People v. Hernandez* (2004) 33 Cal.4th 1040, 1051-1052, overruling *People v. Mayfield* (1972) 23 Cal.App.3d 236.)  Defendant, however, insists that CALCRIM No. 316 would have functioned as more than a limiting instruction in this case.  In the absence of CALCRIM No. 316, defendant argues, the jury would not have known that it could consider the fact that Antoinette had engaged in prostitution in assessing her credibility.

9

Not so.  CALCRIM No. 226's scope is broad.  While it did not name prostitution, it certainly allowed the jury to consider many aspects of Antoinette's credibility including her prior inconsistent statements, her admissions she had lied, and her conduct reflecting on her believability.  Prostitution is a crime of moral turpitude and, consequently, evidence Antoinette was engaged in prostitution was admissible and was admitted to impeach her.  (*People v. Chandler* (1997) 56 Cal.App.4th 703, 708-709.)  We conclude that the jury, having been instructed on the broad scope of factors they could consider in assessing credibility, would reasonably have understood it could take prostitution into account in assessing Antoinette's credibility.  Had defendant felt it necessary to pinpoint the instruction more precisely, and thereby, to identify prostitution expressly, he should have requested the limiting instruction readily found in CALCRIM No. 316.

Of course, defendant has covered this base as well, asserting that his lawyer provided inadequate representation by failing to request the court to instruct the jury in the language provided by CALCRIM No. 316.  " 'If the record on appeal fails to show why counsel acted or failed to act in the instance asserted to be ineffective, unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation, the claim must be rejected on appeal.'  [Citations.]" (*People v. Cunningham* (2001) 25 Cal.4th 926, 1003.)  The Attorney General suggests at least two viable explanations why counsel may have decided to forego the CALCRIM No. 316 instruction.

CALCRIM No. 316 contained the following cautionary language, whereas CALCRIM No. 226 did not:  "The fact that a witness may have committed a crime or other misconduct does not necessarily destroy or impair a witness's credibility."  Strategically, counsel may not have wanted to call the jury's attention to the fact that Antoinette's conduct constituted a crime.  CALCRIM No. 226 accomplished the same goal of focusing the jury's attention on Antoinette's lack of credibility without emphasizing that she herself had engaged in a continuous course of criminal conduct.

10

The other reason counsel may have opted not to request CALCRIM No. 316 is closely related. Counsel simply may not have wanted to attack Antoinette's character based on the fact she was involved in prostitution. He may have feared alienating the jurors who, under the facts in this case, may have been sympathetic to Antoinette given her living situation, her vulnerability, the influence of family members, and the loss of her son. After all, Antoinette testified she was in a very bad place. Defense counsel cross-examined her extensively on her repeated lies and the many inconsistencies in her testimony. He reasonably may have concluded that impeachment based on a failure to be truthful would be more compelling to a jury than the mere fact that life circumstances propelled her into prostitution to support herself. Because there were reasonable tactical justifications for relying exclusively on CALCRIM No. 226, we conclude defendant's lawyer did not provide inadequate representation.

### III

### Sua Sponte Obligation to Instruct on De Facto Expert Testimony

The prosecution did not designate Detective John Sydow of the Sacramento County Sheriff's Department as an expert witness. Assigned to the Human Trafficking Unit of the Special Investigations Bureau, he investigated Antoinette's allegations. Over the course of his career, he became familiar with terminology used by pimps, panderers, and prostitutes and he testified to the meaning of many of those commonly used terms and phrases. Defendant claims his testimony rendered him an expert, whether he was designated or not, and gave rise to the court's sua sponte obligation to instruct the jury on how to consider expert testimony.

CALCRIM No. 332, in defendant's view, should have been given. It provides: "(A witness was/Witnesses were) allowed to testify as [an] expert[s] and to give [an] opinion[s]. You must consider the opinion[s], but you are not required to accept (it/them) as true or correct. The meaning and importance of any opinion are for you to decide. In

11

evaluating the believability of an expert witness, follow the instructions about the believability of witnesses generally.  In addition, consider the expert's knowledge, skill, experience, training, and education, the reasons the expert gave for any opinion, and the facts or information on which the expert relied in reaching that opinion.  You must decide whether information on which the expert relied was true and accurate.  [¶]  You may disregard any opinion that you find unbelievable, unreasonable, or unsupported by the evidence."

Rather than argue the merits of whether the detective was, or was not, an expert, the Attorney General insists that any error in failing to instruct on expert testimony was harmless.  Defendant, relying heavily on *People v. Reeder* (1976) 65 Cal.App.3d 235 (*Reeder*), maintains there is a strong possibility the jury verdict would have been different if the trial court had instructed the jury on the weight to be given expert testimony as required by Penal Code section 1127b.  *Reeder* is easily distinguished and provides little, if any, support for defendant's position.  Adopting the Attorney General's economical approach to evaluate harmlessness without conceding or deciding whether the detective's explanation of terms used in the prostitution business actually constitutes expert testimony deserving of the instruction, we conclude any possible error is harmless.  (See *People v. Mays* (2017) 15 Cal.App.5th 1232, 1238.)

The most striking difference between *Reeder, supra*, 65 Cal.App.3d 235, and the case before us is the degree to which the credibility of the witnesses determined the outcome.  In *Reeder*, polygraph experts gave completely divergent opinions about the truthfulness of the parties' testimony.  Although polygraph results were considered unreliable, the parties had stipulated to their admission.  Justice Puglia explained:  "If, as seems inevitable to us, the polygraph testimony materially influenced the jury, then resolution of the credibility issue as between defendant and victim, in practical effect the ultimate issue in the case, was in significant part determined by the jury's evaluation of the expert testimony.  At this point it bears repeating that polygraph evidence is

12

considered by the great weight of authority to be so unreliable as to be inadmissible without a stipulation. [Citation.] If judicial skepticism is well-founded, the claims of the experts herein are no less extravagant because they are uncontroverted. Undoubtedly, the jury may still give full credit to such testimony where, as here, it is properly before them by stipulation of the parties. If it is to do so, however, it should be with full awareness of its prerogative to discount or disregard even uncontradicted expert opinion if found to be unreasonable. Without that awareness, the critical, skeptical approach necessary to meaningful jury analysis of this questionable yet highly persuasive evidence will be foreclosed. In that event, the danger exists that the sovereign responsibility of the jury may in effect be subordinated to a misplaced faith in 'scientific proof.' A polygraph cannot serve as proxy for defendant's peers." (*Id.* at pp. 242-243.)

In a rape case like *Reeder*, which presented the quintessential credibility contest between a defendant and his victim, evidence as powerful as polygraph expert testimony plays a highly persuasive, if dubious, role. The case before us presents none of the dangers exposed in *Reeder*. First and foremost, defendant's guilt did not rely exclusively on the credibility of his victim. His own conduct provided compelling evidence of his guilt including his damning text messages and his attempt to persuade another woman to falsely claim she was the one who had sent the text messages. Secondly, Antoinette's credibility was challenged by defense counsel exhaustively through cross-examination and the many lies and inconsistencies she told up to and throughout the trial were highlighted effectively for the jury during closing argument. But the so-called expert's testimony confirming the accuracy of Antoinette's use of vernacular associated with prostitution was of little importance and totally unlike the pivotal testimony of the polygraph experts in *Reeder*. Antoinette, by her own admission, was a prostitute and therefore her use of terms customarily used in the trade was to be expected. Unlike the polygraph experts' testimony, which cast grave doubt, if it did not destroy the defendant's credibility, the detective's testimony did not add anything to what the jury

13

already knew—Antoinette was a prostitute familiar with the jargon well known in the business.

In sum, the de facto expert's testimony about a series of words used by pimps and prostitutes added nothing of significance to the prosecution's case. The instruction freeing the jury of any obligation to believe the expert would have had no impact on the outcome of the case because Antoinette's understanding of the terms the detective defined was accurate and had no bearing on whether defendant pandered her. There is no reasonable possibility that CALCRIM No. 332 would have changed the outcome, and as a result, if there was any error, it is harmless.

## IV

### Prosecutorial Misconduct and Ineffective Assistance of Counsel

It is well accepted that a defendant waives his or her right to challenge any missteps by the prosecutor if he or she fails to object at trial. (*People v. Panah* (2005) 35 Cal.4th 395, 462.) Here defendant raised no objection to the prosecutor's closing argument during which she purportedly distorted the reasonable doubt standard. Thus, his challenge to the prosecutor's argument is framed as an ineffective assistance of counsel claim for failure to object. Again he is unable to show the requisite prejudice.

Nearing the conclusion of her closing argument, the prosecutor returned to the theme of reasonable doubt and the burden of proof. She explained to the jury: "You can only find [defendant] not guilty if you have reasonable doubt, and reasonable doubt means an abiding conviction that the charge is true. Do not be intimidated by that standard. It is a standard that jurors all across this country reach every single day. It is a standard that you know in your everyday life, but no one talks like that in real life, okay? I can tell you that I have an abiding conviction and I know beyond a reasonable doubt that my favorite food is anything with buffalo chicken. I know that beyond a reasonable doubt, but I don't talk like that. So do not be intimidated by that standard."

14

We agree with defendant that the prosecutor "trivialized and distorted the reasonable doubt standard when she argued that it is one 'that you know in your everyday life' and then further analogized it to her favorite food." In *People v. Nguyen* (1995) 40 Cal.App.4th 28 (*Nguyen*), a prosecutor similarly argued that the reasonable doubt standard is applied " 'every day in your lives when you make important decisions, decisions about whether you want to get married, decisions that take your life at stake when you change lanes as you're driving.' " (*Id.* at p. 35.) The court found the argument "trivializes the reasonable doubt standard" and was improper insofar as it equated the reasonable doubt standard with the standard people use in everyday life. (*Id.* at p. 36.)

In *Nguyen*, as here, the improper argument was harmless. (*Nguyen, supra*, 40 Cal.App.4th at pp. 36-37 & fn. 2.) To the extent the prosecutor's argument was an improper reassignment of the burden of proof, the remark was brief and mild. (*People v. Gonzalez* (1990) 51 Cal.3d 1179, 1215, superseded by statute on another ground in *In re Steele* (2004) 32 Cal.4th 682, 391.) The question is whether, under these circumstances, as in *Nguyen*, the litany of standard jury instructions could ameliorate the prejudicial effect of the prosecutor's instructions, properly elucidating the reasonable doubt standard. Although we agree with defendant that reasonable doubt plays a vital role in a criminal trial, we nevertheless believe there are unique circumstances, as here, where the potential damage arising from a slight deviation from approved standard language can be cured by proper instructions.

The trial court properly instructed the jury on the reasonable doubt standard as embodied in CALCRIM No. 220, an instruction that has withstood vigorous attack. Pursuant to CALCRIM No. 200, the trial court further instructed the jury that if they believed one of the attorney's comments on the law conflicted with the instructions, they must follow the instructions. For emphasis, the court repeated this admonition before closing arguments. We presume the jurors followed the court's instruction and were savvy enough to realize that the court presented the law, whereas the prosecutor's

comments were spoken as an overly zealous attempt of an advocate to persuade the jury. (*People v. Thornton* (2007) 41 Cal.4th 391, 441.)

Defendant attempts to persuade us with inapposite authority from the Eighth Circuit, which is neither on point nor controlling. In short, the prosecutor's behavior in *Newlon v. Armontrout* (8th Cir. 1989) 885 F.2d 1328, was egregious. "[T]he prosecutor (1) expressed his personal belief in the propriety of the death sentence and implied that he had special knowledge outside the record; (2) emphasized his position of authority as prosecuting attorney of St. Louis County; (3) attempted to link petitioner with several well-known mass murderers; (4) appealed to the jurors' personal fears and emotions; and (5) asked the jurors to 'kill him now. Kill him now.' " (*Id.* at p. 1335.) Given the severity and pervasiveness of the prosecutorial misconduct, it is hardly surprising the court found that the trial court's instructions did not cure the immense harm the prosecutor caused. The court did not hold that standardized instructions can never cure the harm inflicted by a prosecutor; rather, the court held the instructions could not cure the damage the prosecutor's egregious misconduct had caused in this particular case. *Newlon* bears no resemblance to the more benign and isolated mistake the prosecutor made in arguing the case against defendant. Defendant's authority does not bolster his case.

As mentioned, we view any attempt to shift the burden of proof or to diminish the rigor the reasonable doubt standard imposes on jurors as a dangerous incursion into the heart of our criminal justice system. Nevertheless, we cannot say that a slight or mild misstatement of the standard during closing argument can undermine the authority of the court in properly and fully instructing the jury on the law and nuance required in proving that an accused is guilty beyond a reasonable doubt. Here the prosecutor's misstep falls within that narrow category of cases in which the standardized instructions cured any harm her slight misstatement might conceivably have caused. Thus, we conclude defendant's lawyer's failure to object to the argument was harmless.

16

## DISPOSITION

The judgment is affirmed.


                                              _____RAYE_____, P. J.


We concur:


_____ROBIE_____, J.


_____BUTZ_____, J.